## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

LISA BROWN,                        :
                                   :
            Plaintiff,             :          Hon. Dennis M. Cavanaugh
                                   :
     vs.                           :          **OPINION**
                                   :
JO ANNE B. BARNHART                :
COMMISSIONER OF SOCIAL             :          Civil Action No.: 05-2377
SECURITY,                          :
                                   :
            Defendant.             :
_____

### DENNIS M. CAVANAUGH, U.S.D.J.

This matter comes before the Court upon the appeal of Lisa Brown ("Plaintiff"), from the Commissioner of the Social Security Administration's ("Commissioner") final decision denying her request for Supplemental Security Income benefits ("SSI"). This Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g) and §1383(c)(3). This matter is decided without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. As detailed below, it is the finding of this Court that the Commissioner's decision is not based on a complete analysis supported by substantial evidence. Accordingly, the Commissioner's decision is **remanded** for further proceedings consistent with this ruling.

### I. Background

### A. Procedural History

Plaintiff, alleging disability from medical and psychological impairments, filed an application for SSI on December 3, 1999. (R. at 104). Her claims were initially denied and on June 29, 2001, Plaintiff filed a timely request for a hearing before an Administrative Law Judge

1

("ALJ"). (R. at 125). The hearing took place on February 14, 2002. (R. at 30). On March 18, 2002, the ALJ issued a decision denying Plaintiff's application for disability. (R. at 109-114).

On April 15, 2002, Plaintiff filed an unsigned, timely request for review with the Appeals Council. (R. at 137). On May 31, 2002, Plaintiff filed a subsequent claim for SSI. (R. at 149). At the state agency level, it was determined Plaintiff became disabled on May 1, 2002. (Id.) On April 25, 2003, the Appeals Council affirmed the state agency's finding that Plaintiff was disabled beginning May 1, 2002, and remanded the case to the ALJ for resolution of the disability inquiry prior to May 1, 2002. (R. at 149-51).

A post-remand hearing was held on December 2, 2003, before ALJ Muehlig. (R. at 53). The ALJ issued a decision March 12, 2004, holding Plaintiff was not disabled between November 1, 1999, and April 30, 2002. (R. at 16-23). On March 17, 2004, Plaintiff filed an unsigned, timely request for review with the Appeals Council. (R. at 11). The Appeals Council denied Plaintiff's request for review on March 23, 2005. (R. at 5-7). Upon denial, the ALJ's ruling became the Commissioner's final decision. (Id.) On May 5, 2005, Plaintiff filed the instant action before this Court claiming disability "for the period November 1, 1999, to April 30, 2002." (Compl. ¶ 7).

### B. Factual History

Plaintiff was born on February 26, 1962, and she has a high school education. (R. at 34, 263). Plaintiff was 39 years old at the time of the original hearing to determine if she was disabled. (R. at 109). At the time of the post-remand hearing on December 2, 2003, Plaintiff was 41 years old. (R. at 60).

2

### 1. Medical Evidence Concerning Plaintiff's Arthritis, Diabetes, and Hypertension

Between June 22, 2000, and February 2, 2001, Plaintiff sought treatment at St. Peter's University Hospital for pain in her lumbar region, chest, hands, wrists, left elbow, and right hip. (R. at 391-403). All of the examinations that follow were administered by Dr. Mary Zaky, Plaintiff's treating physician at St. Peter's. (Id.) An examination of Plaintiff's lumbar spine on October 10, 2000, did not show any fractures or subluxation. (R. at 391). An examination of Plaintiff's chest on October 10, 2000, revealed a mildly enlarged heart, clear lungs, and no focal areas of consolidation. (R. at 392). The examinations conducted on October 10, 2000, were reviewed and approved by radiologist, Lori Brand-Abend, on October 12, 2000. (R. at 391-392).

Examinations of Plaintiff's right and left wrists on September 21, 2000, did not show any evidence of erosion or joint spacing abnormalities. (R. at 393-394). Examinations of Plaintiff's right and left hands on September 21, 2000, did not show any evidence of fractures, erosion, or joint spacing abnormalities. (R. at 395-396). While her examinations revealed minimal swelling of the third MCP joint in both hands, Dr. Zaky did not diagnosis Plaintiff with any specific form of arthritis. (Id.) An examination of Plaintiff's left elbow on September 21, 2000, revealed no evidence of bone or joint space abnormalities. (R. at 397). Finally, an examination of Plaintiff's right hip on July 28, 2000, did not show any fractures, dislocations, erosion, or joint space abnormalities. (R. at 401). The examinations conducted on September 21, 2000, were reviewed and approved by radiologist, Carol Sarokhan. (R. at 393-397). The examination of Plaintiff's right hip conducted on July 28, 2000, was reviewed and approved by radiologist, Murray Becker, on July 31, 2000. (R. at 401).

In a report for the Division of Disability Determination Services on February 16, 2000, N.A. Cunicella, D.O., Plaintiff's treating physician from July 28, 1995, to February 25, 2000,

noted that Plaintiff had a long history of diabetes mellitus and hypertension. (R. at 267). However, the record shows that Dr. Cunicella failed to find any evidence of diabetic neuropathy. Dr. Cunicella determined the hypertension was erratically controlled due to Plaintiff's poor compliance with her prescribed medications. (R. at 415). Also, Dr. Cunicella stated that Plaintiff had no end organ damage, no chest discomfort, and no cardiovascular symptoms, such as fatigue and heart palpitations. (R. at 268-69). Dr. Cunicella opined that Plaintiff's prognosis was good and that Plaintiff would be unable to participate in any excessive physical activities (including walking, standing, lifting, or carrying) due to her obesity. (R. at 270).

Plaintiff also had two persantine myoview stress tests conducted by Dr. Semer, a cardiologist. (R. at 272, 423). The first test, conducted on February 25, 2000, showed marked global hypokinesis with a calculated ejection fraction of 34%, and mild fixed dilatation of the left ventricle. (R. at 272). The second test, conducted on February 28, 2002, also showed an ejection fraction of 34% with no definite evidence of ischemia, and fixed dilatation of the ventricle, which is indicative of a left ventricular dysfunction. (R. at 423).

During the post-remand hearing on December 2, 2003, Dr. Marvin Chirls, an orthopedic surgeon, made numerous observations regarding Plaintiff's medical condition. (R. at 79-94). Regarding Plaintiff's rheumatoid arthritis complaint, Dr. Chirls stated that Plaintiff "has an increase in [her] SED rate but no other evidence of rheumatoid arthritis." (R. at 79). Furthermore, Dr. Chirls mentioned that all of Plaintiff's x-rays taken at St. Peter's Hospital failed to show any evidence of rheumatoid arthritis. (R. at 80). Regarding Plaintiff's diabetic neuropathy complaint, Dr. Chirls opined that there was no evidence of neuropathy in the record. (R. at 84). Specifically, Dr. Chirls noted that the Plaintiff did not lack sensation in her joints, which is a common indicator of diabetic neuropathy. (Id.)

4

## 2. Psychiatric Evidence Concerning Plaintiff's Depression

On February 22, 2000, Plaintiff underwent a psychiatric evaluation at Catholic Charities. (R. at 263). Dr. Esther Schlesinger, a psychiatrist at Catholic Charities, conducted the evaluation. (R. at 265). Dr. Schlesinger noted that Plaintiff appeared depressed over the break-up with her boyfriend of sixteen years. (R. at 263). However, Dr. Schlesinger stated Plaintiff was verbally cooperative, was not delusional, and denied having hallucinations. (R. at 264). Finally, Dr. Schlesinger increased Plaintiff's prescription for Paxil from 20 milligrams to 30 milligrams. (R. at 266).

Dr. Schlesinger filled out a Social Security Psychiatric Report on August 22, 2000, in which she noted Plaintiff had been taking her medications, but they had not been effective up to that point. (R. at 282). The three individual therapy session notes attached to Dr. Schlesinger's report indicated Plaintiff was still depressed and was encouraged by her therapist to "monitor her health more closely." (R. at 284). The session notes also advised Plaintiff to have therapy sessions every two weeks. (R. at 284-286). However, the time interval between the first and second therapy sessions (May 12, 2000 to June 23, 2000) was almost a month and a half. (R. at 284-85).

On October 7, 2000, Dr. Manuel Villafranca conducted a consultative examination. (R. at 291). During the examination, Plaintiff denied any delusions or hallucinations and told Dr. Villafranca that she had no current suicidal or homicidal tendencies. (R. at 292). Dr. Villafranca diagnosed Plaintiff as suffering from atypical depression and concluded Plaintiff had socialization problems. (R. at 292-93). However, Dr. Villafranca stated Plaintiff maintained her ability to reason. (R. at 293).

5

On November 2, 2001, Andrea Skolnick, LCSW, ACSW, a licensed social worker at Catholic Charities, sent the Social Security Administration a letter stating Plaintiff had been receiving treatment at Catholic Charities since early January 2000, for post-traumatic stress disorder and major depression.  (R. at 417).  Ms. Skolnick opined Plaintiff was "not able to be gainfully employed at this time."  (Id.)  Ms. Skonick noted Plaintiff spent her days in bed sleeping and crying.  (Id.)  Ms. Skolnick also wrote Plaintiff was attending therapy three days per week at Catholic Charities and would need to continue attending these sessions for at least a year.  (Id.)  On December 16, 2002, Dr. Schlesinger reported Plaintiff had been attending therapy sessions at Catholic Charities since December 2000.  (R. at 422).  Furthermore, Dr. Schlesinger stated that Plaintiff had been compliant with her therapy at all times and her depression had worsened over time.  (Id.)

### 3. Psychiatric Review Technique, Residual Functional Capacity Assessments, and Vocational Expert Testimony

On January 3, 2001, Herman Huber, Ph.D., a psychologist, completed a Psychiatric Review Technique Form for Plaintiff.  (R. at 294-306).  Dr. Huber agreed with Dr. Villafranca's diagnosis of atypical depression and opined Plaintiff had a moderate restriction of activities with daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace.  (R. at 304).  Dr. Huber determined Plaintiff did not have any repeated episodes of decompensation.  (Id.)

On May 16, 2001, Dr. Huber completed a Mental Residual Functional Capacity Assessment form ("MRFC").  (R. at 406-408).  Dr. Huber determined Plaintiff was not significantly limited in her ability to understand and remember very short and simple instructions, carry out very short and simple instructions, make simple work-related decisions,

6

interact appropriately with the general public, and respond appropriately to changes in the work setting. (R. at 406-07). Dr. Huber also noted Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and markedly limited in her ability to understand, remember, and carry out detailed instructions. (Id.) Dr. Huber opined that Plaintiff was "moderately depressed with moderate cognitive limitation," but concluded that Plaintiff would be able to "sustain pace/persistence and concentration/attention in low contact work-like settings." (R. at 408).

On March 31, 2000, Dr. Levine completed a Physical Residual Functional Capacity Assessment ("PRFC") assessing Plaintiff's exertional limitations. (R. at 409-16). Dr. Levine noted Plaintiff had the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and stand and/or walk about six hours in an eight-hour workday. (R. at 410). Under the postural limitations section of the PRFC, Dr. Levine determined Plaintiff had the ability to occasionally climb ramps and stairs, balance, and kneel. (R. at 411). On May 17, 2001, Dr. Gillette reviewed Dr. Levine's analysis and agreed with his assessment of Plaintiff's limitations. (R. at 416).

During the post-remand hearing, Rocco J. Meola, a vocational expert, stated Plaintiff's past work experience as a cashier and officer cleaner was categorized as light, unskilled work. (R. at 96-97). Other light, unskilled jobs mentioned by Mr. Meola that Plaintiff was capable of performing included inspector, assembler, produce weigher, and sorter. (R. at 97). However, Mr. Meola also concluded that an individual with moderate limitations in maintaining social functioning, concentration, persistence, and/or pace, would be unable to work in any competitive labor market. (Id.)

7

### 4. Plaintiff's Testimony - December 2, 2003, Post-Remand Hearing

Plaintiff testified she has had arthritis since 1999. (R. at 66). She stated the arthritis in her back, hands, elbows, and knees had gotten worse since the last hearing before the ALJ in March 2002. (R. at 58-59). Plaintiff stated that she cannot tie her shoes or dress herself due to her illness. (R. at 59). Since the birth of her baby in November 1999, Plaintiff has received help from her mother, sister, and other children in caring for the baby. (R. at 62).

Plaintiff also stated that she has had diabetes and has been experiencing cardiac problems since 1999. (R. at 64). According to Plaintiff, some of the cardiac-related symptoms she exhibited were severe chest pain, which began in 2002, and shortness of breath. (R. at 72, 78). Plaintiff stated that she experienced shortness of breath even when she was sitting and not engaging in a physical activity. (R. at 74). Plaintiff testified that Dr. Cunacella, her treating physician, told her to go to Dr. Semer, a cardiologist, for some tests in February 2000. (Id.) Plaintiff also testified that she has been going to Catholic Charities to get treated for depression since 1999. (R. at 66). Plaintiff stated that she attended therapy sessions once a week and saw a psychiatrist once a month at Catholic Charities. (Id.)

Plaintiff claimed that as a result of all her physical problems, she is limited in her abilities to walk, stand, and bend. (R. at 67). Plaintiff also mentioned that she drops things very often. (Id.) Plaintiff mentioned that she worked as a cashier in the early 1980's and briefly worked in office maintenance in 1997. (R. at 63).

## II. Discussion

### A. Standard of Review

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Williams v. Sullivan, 970

F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom. Williams v. Shalala, 507 U.S. 924 (1993).

"Substantial evidence" means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389,

401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "It means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Id. Some types of evidence will not be "substantial." For example,

> [a] single piece of evidence will not satisfy the substantiality test
> if the [Commissioner] ignores, or fails to resolve, a conflict
> created by countervailing evidence. Nor is evidence substantial if
> it is overwhelmed by other evidence – particularly certain types
> of evidence (e.g. that offered by treating physicians) – or if it
> really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health and Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting

Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). The ALJ must make specific findings of

fact to support his or her ultimate conclusions. Stewart v. Secretary of HEW, 714 F.2d 287, 290

(3d Cir. 1983). "Where the ALJ's findings of fact are supported by substantial evidence, the

[reviewing court] is bound by these findings, even if [it] would have decided the factual inquiry

differently." Fargnoli v. Massanari, 247 F.3d 34, 35 (3d Cir. 2001). Thus, substantial evidence

may be slightly less than a preponderance. Stunkard v. Sec'y of Health & Human Servs., 841

F.2d 57, 59 (3d Cir. 1988).

"The reviewing court, however, does have a duty to review the evidence in its totality."

Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727

F.2d 64, 70 (3d Cir. 1984)). In order to review the evidence, "a court must 'take into account

whatever in the record fairly detracts from its weight.'" Id. (quoting Willibanks v. Sec'y of

Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)). The Commissioner has a

corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with

conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)). As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977)). "[The reviewing court] need[s] from the ALJ not only an expression of the evidence [ ]he considered which supports the result, but also some indication of the evidence which was rejected." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). Without such an indication by the ALJ, the reviewing court cannot conduct an accurate review of the matter; the court cannot determine whether the evidence was discredited or simply ignored. See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citing Cotter, 642 F.2d at 705); Walton v. Halter, 243 F.3d 703, 710 (3d Cir. 2001)).

### B. The Five Step Sequential Evaluation Process for Determining Disability

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382. Under the Social Security Act ("Act"), a claimant is eligible for benefits if she meets the income and resource limitations of 42 U.S.C. §§ 1382a & 1382b, and demonstrates that she is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §

1382c(a)(3)(A).   A person is disabled for these purposes only if her physical or mental impairments are "of such severity that she is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

Social Security regulations set forth a five-step, sequential evaluation procedure to determine whether a claimant is disabled. 20 C.F.R. § 404.1520. For the first two steps, the claimant must establish (1) that she has not engaged in "substantial gainful activity" since the onset of [her] alleged disability, and (2) that she suffers from a "severe impairment or "combination of impairments." 20 C.F.R. § 404.1520(a)-(c). Given that the claimant bears the burden of establishing these first two requirements, her failure to meet this burden automatically results in a denial of benefits, and the court's inquiry necessarily ends there. Bowen v. Yuckert, 482 U.S. 137, 146-47 n.5 (1987) (delineating the burdens of proof at each step of the disability determination).

If the claimant satisfies her initial burdens, she must provide evidence that her impairment is equal to or exceeds one of the impairments listed in Appendix 1 of the regulations ("Listing of Impairments"). 20 C.F.R. § 404.1520(d). Upon such a showing, she is presumed to be disabled and is automatically entitled to disability benefits. Id. If she cannot demonstrate that her impairment is equal to or exceeds one of the impairments listed in the Listing of Impairments, the benefit eligibility analysis requires further scrutiny. The fourth step of the analysis focuses on whether the claimant's residual functional capacity sufficiently permits her to return to her "past relevant work."[1]  20 C.F.R. § 404.1520(e). If the claimant is found capable

---

[1]Past relevant work is defined as "work that [Claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(a)(1).

of returning to her past relevant work, then she is not considered disabled and not entitled to disability benefits. Id. If the claimant is unable to return to her past relevant work or has no past relevant work on record, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial, gainful work. 20 C.F.R. § 404.1520(f). If the Commissioner cannot satisfy this burden, the claimant will be entitled to receive disability benefits. Yuckert, 482 U.S. at 146-47 n.5.

## C. RFC Assessments and Analysis of Exertional and Non-exertional Limitations

The residual functional capacity ("RFC") assesses a claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). The RFC assessment rates a claimant's degree of limitation in four broad functional areas to determine whether she has the ability to function in a work environment on a sustained basis. 20 C.F.R. § 404.1520a(2)-(3). The four functional areas used in the RFC assessment are activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(3).

In order to rate the degree of limitation in the first three functional areas, the Commissioner will use a five-point rating system: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). In order to rate the degree of limitation in the fourth functional area, the Commissioner will use a four-point rating system: none, one or two, three, and four or more. Id. If the degree of limitation is "none" or "mild" in the first three functional areas and "none" in the fourth area, the Commissioner usually will conclude that the claimant's impairments are not severe. 20 C.F.R. § 404.1520a(d)(1). The ALJ is responsible for "documenting application of the [RFC] in [his or her] decision." 20 C.F.R. § 404.1520(e).

Furthermore, the ALJ "must include a specific finding as to the degree of limitation in each of the functional areas" discussed above. 20 C.F.R. § 404.1520a(e)(2).

The PRFC assesses the claimant's ability to meet the exertional demands of her job. 20 C.F.R. § 404.1569a(b). Exertional limitations are those limitations that "affect only the ability to meet the strength demands of jobs." Id. If the claimant's impairments only affect her ability to meet the exertional demands of her job, the ALJ may make a determination of disability or non-disability based solely on the guidelines detailed in the Medical-Vocational Rules of Appendix 2. Id.

The MRFC assesses the claimant's ability to meet the non-exertional demands of her job. 20 C.F.R. § 404.1569a(c). Non-exertional limitations are those limitations that "affect only the ability to meet demands of jobs other than the strength demands." Id. If the claimant's impairments impose both exertional and non-exertional limitations, the ALJ's determination of disability or non-disability may not be based solely on the guidelines detailed in Appendix 2. 20 C.F.R. § 404.1569a(d). However, the Appendix 2 guidelines may be used as a framework to guide the ALJ's decision. Id.

### D. The Record Must Provide Objective Medical Evidence

Under the Act, proof of a disability requires objective, medical evidence. "An individual shall not be considered to be under a disability unless she furnishes such medical and other evidence of the existence thereof as the Secretary may require. 42 U.S.C. § 423(d)(5)(A). Additionally, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section." Id. Specifically, a finding that one is disabled requires:

> medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychologist abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph... would lead to a conclusion that the individual is under a disability.

Id.; see 42 U.S.C. § 1382c(a)(3)(A) (defining a disabled person as one who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment...").

Furthermore, S.S.R. 96-7p provides:

> the adjudicator must evaluate the intensity, persistence and limiting effects of the [claimant's] symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work-related activities. To do this, the adjudicator must determine the credibility of the individual's statements based on consideration of the entire case record. The requirement for a finding of credibility is found in 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4).

Nevertheless, a claimant's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect... [one's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b); see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (rejecting claimant's argument that ALJ failed to consider his subjective symptoms where ALJ made findings that complaints of pain and symptoms were inconsistent with objective medical evidence and claimant's hearing testimony); Williams, 970 F.2d at 1186 (denying claimant benefits where claimant failed to proffer medical findings or signs that he was unable to work); Green v. Schweiker, 749 F.2d 1066, 1069-70 (3d Cir. 1984) (emphasizing that "subjective complaints of pain, without more, do not in themselves constitute disability.").

14

### E. The ALJ's Decision

Using this sequential evaluation process, the ALJ determined that Plaintiff had satisfied the requirements of step one because she had not engaged in any substantial gainful activity since November 1, 1999, the alleged onset of her disability. (R. at 17). At step two, the ALJ determined that Plaintiff had diabetes mellitus, hypertension, and depression, all of which qualified as severe impairments within the meaning of the Regulations. (Id.)

Under step three, the ALJ determined that none of Plaintiff's impairments, considered individually or in combination, equaled or exceeded one of the impairments listed in the Listing of Impairments. (Id.) Specifically, the ALJ found that Listing 9.08, pertaining to diabetes mellitus, was not met due to the absence of neuropathy, acidosis, or retinitis proliferans. (Id.) Also, the ALJ established that Listing 12.04, pertaining to affective disorders, was not met due to the absence of marked restrictions of activities of Plaintiff's daily life, marked difficulties in maintaining social functioning, and marked difficulties in her concentration, persistence, or pace. (Id.)

At step four, the ALJ determined Plaintiff had no past relevant work experience. (R. at 21). Finally, the ALJ moved to the fifth and final step, determining whether there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, given her residual functional capacity, age, education, and work experience. (Id.) Given Plaintiff's young age, high school diploma, the testimony of the vocational expert, and Plaintiff's ability to perform a significant range of light work, the ALJ concluded Plaintiff was not disabled. (R. at 21-22).

### III. Analysis

15

Plaintiff contends the ALJ's decision of non-disability for the period between November 1, 1999, and April 30, 2002, was not based on substantial evidence of record. (Pl.'s Br. 5). Specifically, Plaintiff claims the ALJ failed to consider the extent to which Plaintiff's non-exertional limitations eroded her occupational base. (Pl.'s Br. 10). For the reasons set forth below, the Court remands this case for further proceedings consistent with this Opinion.

## A. Plaintiff's Mental Impairment and the ALJ's Decision

In a report completed on January 3, 2001, Dr. Huber determined Plaintiff exhibited the following functional limitations: moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (R. at 304). If present, these moderate limitations would affect Plaintiff's ability to engage in work-related activities from one-third to two-thirds of an eight-hour workday. (R. at 98).

In his opinion, the ALJ stated that Plaintiff only had "functional limitations of mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and mild deficiencies of concentration, persistence or pace." (R. at 20). In reaching this conclusion, the ALJ substituted his own judgment for that of Dr. Huber, who is recognized as a non-examining expert by the Social Security Administration. (R. at 99). The ALJ justified his conclusion that Plaintiff's "mental impairment has had no greater than a minimal impact… in her ability to perform basic work functions" based on his belief that there was an absence of objective clinical findings demonstrating the aforementioned moderate limitations. (R. at 22).

The ALJ accorded little weight to the psychiatric evaluations conducted by Dr. Villafranca and Dr. Huber. Dr. Villafranca opined Plaintiff had an impairment of socialization and diagnosed Plaintiff with atypical depression. (R. at 291-293). The ALJ discounted Dr.

16

Villafranca's assessment of Plaintiff's mental condition because he believed the assessment was based solely on Plaintiff's subjective complaints. (R. at 21). The ALJ also discounted Dr. Huber's functional limitations analysis because he believed it was based on data obtained from Dr. Villafranca's flawed assessment of Plaintiff's mental condition and accompanying diagnosis of atypical depression. (Id.)

While the ALJ believed there were not enough objective findings to substantiate Plaintiff's subjective complaints (as well as the evaluations by Dr. Villafranca and Dr. Huber), the record indicates otherwise. The notes from Plaintiff's individual therapy session on May 12, 2000, indicated Plaintiff was depressed and "hopeless about her life." (R. at 284). The notes from Plaintiff's therapy session on August 4, 2000, indicated Plaintiff was still exhibiting depressive symptoms and was excessively angry. (R. at 286).

In addition, Andrea Skolnick, LCSW, ACSW, of Catholic Charities, in a letter to the Social Security Administration on November 2, 2001, stated that Plaintiff had severe depression and due to her depression was unemployable at that point in time. (R. at 417). Ms. Skolnick noted Plaintiff was enrolled in Catholic Charities' Adult Psychiatric Day Care Program and attended therapy three days per week. (Id.) Finally, Esther Schlesinger, M.D., a psychiatrist, submitted a report on December 16, 2002, which stated Plaintiff had been treated at Catholic Charities since December 2000 for Major Depression and Post-Traumatic Stress Disorder. (R. at 422). Dr. Schlesinger also mentioned that Plaintiff had been compliant with her therapy but that her depression had worsened over time. (Id.)

In his opinion, the ALJ noted Ms. Skolnick had written a letter on Plaintiff's behalf and the findings in Dr. Schlesinger's report when he summarized Plaintiff's psychiatric history. Despite the existence of factual findings in support of Dr. Villafranca's diagnosis of atypical

depression and Dr. Huber's assessment of moderate limitations, the ALJ concluded that Plaintiff's "mental impairment has had no greater than a minimal impact" in her ability to perform basic work functions. Because the ALJ arrived at this conclusion without explaining his rationale for discounting the objective psychiatric evidence establishing Plaintiff's severe mental impairment, the ALJ's determination that Plaintiff's mental impairment was of minimal severity was not based on substantial evidence.

### B. Plaintiff's Limitations in Three Functional Areas

During the December 2, 2003 post-remand hearing, the ALJ only asked Rocco J. Meola, the vocational expert, to provide examples of jobs in the national economy that were available to an individual with Plaintiff's past work experience and educational background.[2] (R. at 96-97). After the ALJ asked this question, Plaintiff's attorney asked Mr. Meola if Plaintiff's ability to perform certain light, unskilled jobs would be diminished by the moderate limitations Dr. Huber found and described in his functional limitations assessment.[3] (R. at 97).

In his opinion, the ALJ accorded little weight to Mr. Meola's testimony regarding the impact of Plaintiff's moderate limitations because he believed the moderate limitations reported by Dr. Huber were largely based on Plaintiff's subjective complaints and not supported by objective findings. However, as mentioned in Section III(A), the record does contain objective

---

[2] ALJ:   What types of jobs would be available for someone with [Plaintiff's] education level and –

VE:   Claimant has a high school education, and she did work as a cashier. That work is considered generally unskilled and light. So someone who can work at the light level could certainly do that work. Office cleaning is generally considered light work activity. It's also unskilled... Other types of light jobs would be inspector, an assembler, produce weigher, sorter. Would be all light, unskilled jobs. (R. at 96-97).

[3] ATTY:   Would you assume for the moment that there's a moderate for the Claimant in maintaining social functioning, and in maintaining concentration, persistence, and/or pace. Would those limitations have a negative impact on her ability to do those jobs, and if so, to the extent that they would be precluded?

VE:   With a moderate limitation in those areas I would say that the person would not be able to work in any competitive labor market. (R. at 97).

18

evidence of Plaintiff's depressive condition, which support Dr. Huber's findings of moderate limitations.

More importantly, the ALJ did not meet his burden of proving that Plaintiff was capable of performing other gainful, substantial work. 20 CFR § 404.1520(f). The ALJ failed to provide specific evidence to support his conclusion that Plaintiff has mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Because the ALJ failed to support his conclusion that Plaintiff was mildly limited in these three functional areas, the ALJ's determination that Plaintiff was not disabled and that there were light, unskilled jobs in the national economy that Plaintiff could perform was not based on substantial evidence.

## IV. Conclusion

For the aforementioned reasons, the Court **remands** the ALJ's disability determination for further proceedings consistent with this opinion. An appropriate Order accompanies this Opinion.

Dennis M. Cavanaugh, U.S.D.J.

Date: June 27, 2006
Original: Clerk's Office
cc: All Counsel of Record
File

19